UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| MARY BETH RYDER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-497-JJM-LDA |
| | ) | |
| PEARSON EDUCATION, INC., | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Plaintiff Mary Beth Ryder worked as a business development manager selling education materials for Defendant Pearson Education, Inc. ("Pearson"). After being denied a performance bonus, being placed on a performance improvement plan, and being terminated, Ms. Ryder sues Pearson, alleging breach of contract, wage claim violations, misrepresentation, and discrimination based on gender and disability. ECF Nos. 1, 23. Pearson moves for summary judgment on each count. ECF No. 54. Ms. Ryder opposes Pearson's summary judgment and files her own Motion for Summary Judgment on Counts I and IV. ECF Nos. 66, 82.

I.    BACKGROUND

A.  Facts

Pearson sells education materials to large companies such as universities. ECF No. 65 at 1, ¶ 1. Pearson hired Ms. Ryder as a business development manager ("BDM") on its Private Sector Team in late 2013. *Id.* As a BDM, Ms. Ryder was supposed to achieve sales goals established by Pearson's Sales Incentive Plans

("SIP"), which were designed to incentivize BDMs. *Id.* at ¶¶ 2-3. Ms. Ryder's 2014

SIP, which she received in June 2014, states:

> Eligible employees can earn up to a maximum of $250,000 annually in total (commissions and bonus) under this SIP. Any earnings in excess of $125,000 will be paid in two equal installments in the two years subsequent to the initial bonus year–provided you continue to achieve your sales goals in each of the two subsequent years & provided you have a satisfactory performance rating. In other words, in order to earn the rollover payment in the first subsequent year, you must make your sales goal in that year; then, in order to earn your rollover payment in the second subsequent year, you must have made your sales goal in the first subsequent year and you must make your sales goal in the second subsequent year. The rollover payment will be paid after the end of the Plan Year in accordance with the administrative plan guidelines in effect at that time. Subsequent years' sales targets are at the discretion of management and will be set in a manner consistent with current plan targets.

ECF No. 56 at 3, ¶ 19.

In 2014, Ms. Ryder worked for Mark Wheeler, as part of a team of BDMs. *Id.* at ¶ 11. Under her 2014 SIP, she had to reach a goal of at least $4,000,000 in "signings," which are "the estimated value of all Pearson products and services the customer contractually promises to buy in the future." ECF No. 65 at 2, ¶¶ 6-7. Ms. Ryder signed over $17,000,000. *Id.* at ¶¶ 11-13. Under the 2014 SIP, Mr. Ryder earned $250,000 in commissions for meeting her sales goal, and was eligible to receive an additional $284,000 the next two years (for a total of $534,000). *Id.* The additional $284,000 was "to be paid in two equal installments . . . provided [Ms. Ryder] continue[d] to achieve [her] sales goals in each of the two subsequent years" and had a satisfactory performance rating. *Id.*; ECF No. 56 at 3, ¶ 19. It is undisputed that Ms. Ryder exceeded her sales goal of $6,750,000 in 2015, earning her over $67,000 in

2

commission.   ECF No. 65 at 2, ¶ 15.   Ms. Ryder also earned a $10,000 additional bonus as well as the 2015 installment of her 2014 rollover payment bonus, which was $142,171.   *Id.*

To downsize, Pearson eliminated Mr. Wheeler's team at the end of 2015 and reassigned Ms. Ryder to the Associations, Government, Career Pathways ("AGC") team.   *Id.* at ¶¶ 15-16.   After his team was eliminated, Mr. Wheeler created a list of twenty-four potential signings near conclusion ("2015-Wheeler-Deals").   ECF No. 56 at 9, ¶ 70.   At the time of the reassignment, Ms. Ryder was working on two 2015-Wheeler-Deals for existing Pearson clients: Bryant and Stratton University (B&S) and an association called the American Health Information Management Association ("AHIMA" and together with B&S, "BS/A").   ECF No. 65 at 5, ¶ 19.

Ms. Ryder began working with the AGC team in January 2016 and reported directly to Leeane Fisher.   *Id.* at ¶ 22.   Ms. Fisher reported to Rick Ditzel who reported to Eric Kuennen, vice president of sales at Pearson.   *Id.*   On the AGC team, Ms. Ryder worked with other BDMs, including Manny Washington.   *Id.*   The priorities on the AGC team stayed the same for BDMs, who were tasked with achieving their "signings" and "revenues" goals for 2016.   *Id.* at ¶ 24.   Mr. Kuennen and Ms. Fisher authorized Ms. Ryder to keep working on the BS/A sale.   *Id.* at ¶¶ 21, 26, 33.   From January to August, Ms. Ryder worked on the BS/A deal.   *Id.* at ¶ 29.   During this time, Ms. Ryder did not know that her work on the BS/A deal would not count toward her 2016 signings goal.   *Id.* at ¶¶ 32-34.

Ms. Ryder's received a six-month performance review in July 2016 by Ms. Fisher, criticizing Ms. Ryder for not submitting her company expense receipts on time, tracking sales leads properly, and for needing "more communication and teamwork." *See* ECF No. 67-8 at 7, ¶ 3.  In June 2016, comparing Ms. Ryder to Mr. Washington, Ms. Fisher said that:

> [Mr. Washington] is working hard; has a plan; communicates with me daily on email; we talk about 3 times a week; I am on his calls with him; we talk strategy; and he is out prospecting and making this happen.
>
>  * * *
>
> So in comparing [Mr. Washington] to [Ms. Ryder], there is a skill set gap; communication and inclusion needs to happen; and trust from me is just not there.

ECF No. 80-19 at 2.

In August 2016, Ms. Fisher assigned new deals to Mr. Washington and to Ms. Ryder.  ECF No. 80 at 10, ¶ 33.  Mr. Washington received a pending signing with the National Association Process Technology Alliance ("NAPTA") and AHIMA.  *Id.* at ¶ 33.  Ms. Fisher received the Global Association of Risk Professionals ("GARP").  *Id.* at ¶ 34.  Both GARP and AHIMA were considered "dogs."  *Id.* at ¶ 34.  As early as August 2016, Ms. Fisher knew that a large portion of Ms. Ryder's work on the GARP signing would not count toward her 2016 signings goal because GARP had been an active Pearson account for five years.  *Id.* at ¶ 39.  Ms. Fisher did not tell Ms. Ryder this at the time of assignment.  *Id.* at ¶ 41.  Ms. Fisher knew the NAPTA deal would count toward Mr. Washington's 2016 signings goal.  *Id.*

In September 2016, with the approval of Mr. Kuennen and other Pearson management, Ms. Ryder closed the BS/A deal for $3,400,000.  ECF No. 65 at 8, ¶¶ 34-

35.  Mr. Kuennen told the finance department that Ms. Ryder's BS/A signing should count toward her 2016 signings goal.  *Id.* at ¶ 37.  But, unbeknownst to Ms. Ryder, Robert Klein, Pearson's finance executive, responded to Mr. Kuennen stating that the BS/A signing would not count toward Ms. Ryder's 2016 goals.  *Id.* at ¶ 38.

A few weeks after signing the BS/A deal, Ms. Ryder questioned Ms. Fisher about receiving her 2016 SIP.  *Id.* at ¶ 41.  Ms. Fisher and Mr. Ditzel scheduled a call with Ms. Ryder for October 26, 2016 and let Ms. Ryder know that her 2016 SIP had not been finalized by the finance department.  *Id.* at ¶¶ 43-44.  On this call, Ms. Ryder was also placed on a performance improvement plan ("PIP") for poor performance. *Id.* at ¶ 45.  The PIP said that:

> [e]ach [BDM] was tasked with a signing target of new contracts of 1 million dollars and a pipeline target of 3 million.  You have met your signed contract goal with Bryant and Stratton at 3.8 million; however, this is a legacy signing from Higher Ed and not representative of new acquisitions this year.  To date, you have no new client contracts for 2016.

ECF No. 67-13 at 4.  The PIP also said that Ms. Ryder had zero dollars in revenue to date and that the list of deals she was working on was too small.  ECF No. 65 at ¶ 49.

Ms. Ryder challenged the claims that she was not on track to meet her signings and revenue goals, showing that she was on track to achieve her revenue goal and that her pipeline goal would have exceeded Ms. Fisher and Mr. Ditzel's $3,000,000 expectation had Pearson allowed her the opportunity to sign a $3,000,000 contract with GARP.  *Id.* at ¶¶ 50-52.  After investigating Ms. Ryder's claim, Mr. Ditzel and Ms. Fisher discovered that Ms. Ryder was, in fact, on track to meet her 2016 revenue goal.  *Id.* at ¶¶ 53-54.

Ms. Ryder's PIP required her to draft a business plan, submit a daily log of all work activities at the end of each business day, submit detailed itineraries for business travel two weeks in advance, update Ms. Fisher regularly, and copy her on email. ECF No. 80 at ¶ 61. Ms. Ryder filed a complaint about these requirements to Pearson's human resources office, saying:

> The reporting requirements are tedious, designed to harass, frustrate, and otherwise designed to provoke me to leave my employment. They are further designed to fatigue me given my diagnosed condition of Attention Deficit Disorder—in violation of the American with Disabilities Act.

*Id.* at ¶ 62.

Ms. Ryder received her 2016 SIP in November 2016, less than eight weeks before the end of Pearson's performance year. ECF No. 65 at 11, ¶ 57.

Ms. Ryder's 2016 SIP included a signings goal of $1,000,000 and a revenue goal of $877,000. *Id.* at ¶ 59. The 2016 SIP also included the following:

> **Final Authority**: The National Sales Director and Chief Financial Officer are responsible for administering the incentive plan, and will have final decision authority regarding all matters relating to calculation of any incentive award payable thereunder, interpretation of the Plan and any situations not specifically addressed by the Plan, and interpretation of individual, unit, or Company performance or achievement of goals or targets, and all such decisions shall be final and binding.

ECF No. 67-6 at 38 (emphasis original). The 2014 SIP included similar provisions:

> **All decisions, actions, or interpretations concerning the SIP made by its administrators shall be final, conclusive, and binding on all parties.**
>
> * * *
> Management reserves the right to make final interpretations of the provisions of the SIP and of any situations not specifically addressed by the SIP. In addition, management shall have the final authority and

6

> shall make final decisions on all matters relating to incentive payments
> under the SIP or calculations related to the SIP, including but not
> limited to calculation of individual bonuses or interpretation of
> individual, unit, group performance or achievement of goals, and all
> such decisions shall be final and binding.

ECF No. 67-2 at 38-39 (emphasis original).

Shortly after receiving her 2016 SIP, Ms. Ryder emailed Ms. Fisher about her PIP. ECF No. 67-1 at 50-52. In her response, Ms. Fisher explained to Ms. Ryder that the BS/A deal did not meet the requirements to count as new business for Ms. Ryder's 2016 SIP and that Ms. Ryder had a right to receive a one-time signings commission of .045% of the incremental revenue for that deal. *Id.* Ms. Fisher also said that the anticipated GARP signing would not count as "new" either for her 2016 signings goal, a fact Ms. Fisher had known since early September. ECF No. 80 at 18, ¶ 68.

In December 2016, Ms. Fisher gave Mr. Kuennen a preliminary report on all the year-to-date signings on the AGC team and included Ms. Ryder's BS/A signing. ECF No. 65 at 13, ¶ 66. Both Mr. Kuennen and Ms. Fisher believed that Ms. Ryder's BS/A deal should count toward her signings in 2016, allowing her to receive her second rollover payment from 2014. *Id.* at ¶ 68. However, Pearson deposited $15,109 into Ms. Ryder's checking account as a one-time commission for the BS/A deal. *Id.* at ¶ 69.

In December 2016, Ms. Ryder closed the GARP deal. ECF No. 80 at 20, ¶ 71. An initial computation of the GARP deal calculated it to be at $1.4 million but later revised to $818,050, the value of the total signing amount, minus the amount of revenue Pearson received from that customer for sales the prior year. ECF No. 81

at 12, ¶ 57.  Ms. Ryder alleges that by the end of 2016, she signed $4,100,000 of new business through three deals:  GARP, Douglas Education, and BS/A.  ECF No. 65 at ¶ 70.  Pearson maintains that Ms. Ryder's signings at the end of 2016 were $818,000. ECF No. 70 at 18, ¶ 70.

At the beginning of 2017, Ms. Ryder was notified that her PIP formally ended on December 30, 2016, and that she satisfied each of the requirements.  ECF No. 65 at 13, at ¶ 71.  In February 2017, Ms. Fisher gave Ms. Ryder her annual performance review.  *Id.* at ¶ 72.  Ms. Ryder corrected several mistakes that Ms. Fisher made as to Ms. Ryder's recorded work performance goals.  *Id.*

In March 2017, Pearson's vice president of finance, Joe Marinaro, approved a payout commission to Ms. Ryder of $167,000, which included the second installment of her 2014 rollover payment.  *Id.* at ¶¶ 74-75.  Mr. Klein, however, reversed the approval after consulting with Robin Baliszewski, Pearson's managing director for higher education sales in North America.  *Id.*  They concluded in an email that Ms. Ryder did not meet her signings goal but did meet her revenue goal.  *Id.*  Mr. Klein also concluded that Ms. Ryder was eligible to receive half of her rollover payment ($71,000).  *Id.*  After discussing the issue with finance and Ms. Baliszewski, however, Ms. Ryder was notified that the BS/A deal would not be credited as a signing and that she would not receive her second rollover payment from 2014.  *Id.* at ¶ 76.  During a follow up call that Ms. Ryder requested, Ms. Ryder challenged Pearson's decision and sent a request for reconsideration in the form of a demand letter.  *Id.* at ¶ 79.

8

In 2017, Ms. Ryder filed a charge of discrimination with the Rhode Island Commission for Human Rights ("RICHR") alleging disability and gender discrimination under the Rhode Island Fair Employment Practices Act. *See* ECF No. 56 at 17. In October 2017, Ms. Ryder filed her original Complaint, alleging breach of contract, wage claim violations, misrepresentations, unjust enrichment, and disability and gender discrimination. ECF No. 1 at 10-16, ¶¶ 63-129.

In the summer of 2017, Thomas Malek, Pearson's senior vice president for partnerships inherited Ms. Fisher's team of BDMs. ECF No. 80 at 32, ¶ 140. In this new role, Mr. Malek began moving employees to different teams, including Mr. Washington, who was moved to a team focusing on career schools. *Id.* at ¶¶ 142-43. Mr. Malek was also tasked with downsizing Pearson's sales force in early 2018 for a project known as "Project Oak." *Id.* at ¶ 144. Mr. Malek made termination decisions based on a rating system in consultation with other Pearson managers, including Ms. Fisher. *Id.* at ¶¶ 147, 151-59. While Mr. Washington's performance was rated "average," Ms. Ryder, who was rated by Ms. Fisher and Mr. Malek, was the only Pearson employee to receive two "1" ratings, the worst available rating. *Id.* at ¶ 158. Ms. Ryder was terminated in June 2018. *Id.* ¶¶ 145, 159. Before terminating Ms. Ryder, Mr. Malek was informed by Pearson's human resources office about Ms. Ryder's lawsuit against Pearson and her claims. *Id.* at ¶ 145.

In 2018, Ms. Ryder applied for a new position at Pearson entitled "Executive Director of Strategic Partnerships." ECF No. 23 at 11, ¶ 74. Ms. Ryder alleged that she was not interviewed for the position. *Id.* at ¶ 74. Pearson hired Fouad Saleet—

who previously worked with Dartmouth College, Colgate University, and the University of Massachusetts—for the position instead.  ECF No. 81 at 40, ¶ 162.

Ms. Ryder filed an Amended Complaint on August 1, 2018.  ECF No. 23.  In her Amended Complaint, Ms. Ryder added claims of retaliation for failure to hire and termination, and whistleblower retaliation.  *Id.* at 18-22, ¶¶ 153-88.

### B. Claims

Ms. Ryder sues Pearson asserting: breach of contract (Count I); breach of the covenant of good faith and fair dealing (Count II); gender discrimination under R.I. Gen. Laws §§ 42-112-1 et seq. ("RICRA") (Count III); Rhode Island wage claim violations (Count IV); intentional misrepresentation (Count V); negligent misrepresentation (Count VI); retaliation for failure to hire/promote and for termination under RICRA (Counts X and XI); and whistleblower retaliation (Count XII).  ECF No. 23 at 12-22, ¶¶ 81-188.[1]

Pearson moves for summary judgment on each count.  ECF No. 54.  Ms. Ryder moves for summary judgment on Counts I and IV (ECF No. 66), and opposes summary judgment on Counts II, III, V, VI, X, XI, and XII.  ECF No. 82.

Pearson also moves to strike certain statements in the Statements of Disputed Facts filed by Ms. Ryder (ECF Nos. 66, 81) and deem such statements as undisputed, arguing that these statements are not supported by appropriate record citations.

---

[1] Ms. Ryder voluntarily dismissed Count VII (Unjust Enrichment), Count VIII (Failure to Accommodate, Disability Discrimination and Retaliation under RICRA), and Count IX (Retaliation Failure to Transfer under RICRA).  ECF No. 82-1 at 59.

ECF Nos. 71, 89, and 98.  Pearson also moves to strike identified portions of the declarations of Ms. Ryder (ECF No. 80-30) and Erin Smith (ECF No. 80-44) because, according to Pearson, the identified portions rely on inadmissible hearsay and conclusory assertions.  ECF Nos. 89, 98.

The Court DENIES the Defendant's Motions to Strike.  ECF Nos. 71, 89, 98. In denying these motions, the Court notes that, if facts or statements were unsupported by the record evidence presented or appear to be based upon hearsay or other inadmissible evidence, the Court has not relied on them in its summary judgment determinations.  *See Bond v. Mass. Bay Commuter R.R., LLC*, No. CIV.A. 12-10787-DPW, 2013 WL 6147036, at *5 n.2 (D. Mass. Nov. 22, 2013).

The Court also DENIES Ms. Ryder's Motion for Reconsideration as moot.  ECF No. 99.

## II.   STANDARD OF REVIEW

When making a summary judgment determination, the Court must review the entire record and consider the facts and inferences in the light most favorable to the nonmoving party.  *Cont'l Cas. Co. v. Canadian Univ. Ins. Co.*, 924 F.2d 370, 373 (1st Cir. 1991).  Federal Rule of Procedure 56(a) dictates that summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A genuine dispute of material fact is an issue that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"Genuine issues of material fact are not the stuff of an opposing party's dreams. On issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)). Summary judgment evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989).

The parties have both filed motions for summary judgment, but "[t]he presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006). In evaluating cross-motions, the Court must decide whether either party is entitled to judgment as a matter of law based on the undisputed facts. *Scottsdale Ins. Co. v. Torres*, 561 F.3d 74, 77 (1st Cir. 2009).

## III.   DISCUSSION

### A.   Count I: Breach of Contract

In her Amended Complaint, Ms. Ryder alleges that Pearson breached its agreement with her, memorialized in her 2014 SIP and 2016 SIP, by failing to pay her the second installment of her 2014 rollover payment and her 2016 bonus. ECF No. 23 at 12, ¶¶ 81-89. Ms. Ryder alleges that, because of Pearson's breaches, she suffered and continues to suffer damages. *Id.* at ¶ 89.

12

In its Motion for Summary Judgment, Pearson argues that Ms. Ryder did not meet the eligibility criteria to receive her 2014 rollover payment and 2016 bonus because she did not meet her 2016 signings goal. ECF No. 55 at 3. According to Pearson, because Ms. Ryder failed to fulfill the contingency to receive the second installment of her rollover bonus in her 2014 SIP and failed to meet her signings goal in her 2016 SIP, there is no breach of contract, and summary judgment should be granted in its favor. *Id.*

In response, Ms. Ryder disputes Pearson's assertion that she did not fulfill the contingency to earn the second installment of her rollover payment because, according to her, the 2016 SIP states clearly that her signings goal is $1,000,000 and unambiguously includes signings of any type. ECF No. 67 at 18. According to Ms. Ryder, nowhere in the 2016 SIP does Pearson state that Ms. Ryder's signings need to be in "any channel of commerce or of any specific type to count toward her 2016 goal." *Id.* Ms. Ryder contends that Pearson's allegation, expressed to Ms. Ryder in early 2017, that the BS/A signing did not count toward Ms. Ryder's 2016 signings goal because it was a "legacy" deal from 2015 lacks merit because the term "legacy" is completely absent from the 2016 SIP. *Id.* at 19. If "legacy" meant anything substantial to Pearson in 2016, according to Ms. Ryder, Pearson would have defined "legacy accounts" in the SIP and try to include some sort of exclusion for those deals. *Id.* While Pearson did not include "legacy" in the 2016 SIP, it did include an "Entire Understanding" clause saying that the 2016 SIP can be changed only in writing. *See* ECF No. 67-6 at 38. The SIP was never modified in writing and, under the parol

evidence rule, Ms. Ryder asserts that allegations of Pearson's best intentions and wishes in early 2016 are "inadmissible to alter the terms of a writing that is integrated on its face." ECF No. 82 at 53-54 (citing *E. Greenwich Fire Dist. by & Through Zaino v. Henrikson*, 632 A.2d 641, 642 (R.I. 1993) (quoting *Fram Corp. v. Davis*, 401 A.2d 1269, 1272 (1979)).

Pearson, however, asserts that it correctly applied its unilateral discretion to decide how sales employees would be compensated for 2015-Wheeler-Deals, such as BS/A. ECF No. 69 at 4. Based on the uniform application of that determination, according to Pearson, the BS/A signing did not count, which meant that Ms. Ryder did not fulfill the contingency—achieving a minimum $1,000,000 signings goal—to earn her second rollover payment and her 2016 bonus. *Id.* Ms. Ryder's incentive compensation eligibility is, according to Pearson, defined in the SIPs and her subjective belief as to the parties' behavior regarding BS/A has no legal significance on Pearson's determination that she failed to meet the 2016 signings goal. *See id.*

Ms. Ryder argues that the determination to exclude 2015-Wheeler-Deals for 2016 signings goal, and instead make a one-time bonus payment, could not apply because that determination was made in April 2016 before her 2016 SIP was finalized. ECF No. 82-1 at 53-54. According to Ms. Ryder, Pearson is claiming to have exercised discretion to interpret a document that did not even exist at the time of its interpretation, which Ms. Ryder claims is prohibited by the 2016 SIP. *Id.*

But Pearson asserts that Ms. Ryder's argument ignores "two fundamental and undisputed points." ECF No. 87 at 4. First, the April 2016 agreement was a

determination that all 2015-Wheeler-Deals would be treated uniformly (*i.e.* a one-time signings commission and no further credit). *Id.* Pearson argues that Ms. Ryder incorrectly conflates the timing of the April 2016 determination with Pearson's application of it to the 2016 SIP, which is when it paid Ms. Ryder $15,106.50 in December 2016, after the BS/A deal was signed. *Id.* Second, according to Pearson, nothing about the 2016 SIP required Pearson to customize the language to incorporate the particular facts of each salesperson. Instead, the 2016 SIP precluded future uncertainties by reserving "final decision authority regarding all matters relating to the calculation of any incentive award payable thereunder, interpretation of the Plan, and any situation not specifically addressed by the Plan . . . ." ECF No. 81 at 10-11, ¶ 50.

"To succeed on a breach of contract claim under Rhode Island law, a plaintiff must prove that (1) an agreement existed between the parties, (2) the defendant breached the agreement, and (3) the breach caused (4) damages to the plaintiff." *Barkan v. Dunkin' Donuts, Inc.*, 627 F.3d 34, 39 (1st Cir. 2009) (citing *Petrarca v. Fid. & Cas. Ins. Co.*, 884 A.2d 406, 410 (R.I. 2005)). Both Pearson and Ms. Ryder agree that the 2014 SIP and the 2016 SIP are contracts, and that they constitute the contracts in question. But they dispute whether Pearson breached these agreements when it declined to count the BS/A signing toward Ms. Ryder's sales goals and thus denied the second payment of her rollover bonus and payment of her 2016 bonus.

Under the 2014 SIP, Mr. Ryder was eligible to receive the second installment of her 2014 rollover payment "provided [she] continue[d] to achieve [her] sales goals"

and had a satisfactory performance rating.  ECF No. 56 at ¶ 19.  Mr. Ryder's 2016

SIP included a signings goal of $1,000,000 and a revenue goal of $877,000.  ECF No.

65 at 12, ¶ 59.  Ms. Ryder alleges that by the end of 2016, she signed $4,100,000 of

new business.  ECF No. 65 at ¶ 70.  Pearson maintains that Ms. Ryder's signings at

the end of 2016 were $818,000.  ECF No. 70 at 18, ¶ 70.

The 2016 SIP provided Pearson "final decision authority regarding all matters

relating to the calculation of any incentive award payable . . . interpretation of the

Plan, and any situation not specifically addressed by the Plan . . . ."  ECF No. 67-6 at

38; ECF No. 81 at 10-11, ¶ 50.  Thus, Person had unilateral discretion to decide how

to determine how sales employees would be compensated for 2015-Wheeler-Deals,

including the BS/A.  In exercising this discretion, Pearson declined to include 2015-

Wheeler-Deals in the calculation of sales employees 2016 incentive plans and instead

chose to compensate them as one-time commissions to address the remaining deals

from the previously discontinued Wheeler Team.  ECF No. 81 at 25-26, ¶¶ 96-101.

Because the contract granted Pearson the right to interpret the SIP and make this

business judgment, the Court finds that Pearson did not breach its agreement with

Ms. Ryder.

The Court is not swayed by Ms. Ryder attempts to point to the lack of a

definition of "signings" in the 2016 SIP to mean that it inherently means signings of

any type.  ECF No. 67 at 18.  Because Section 2 Achievement Indicators of the 2016

SIP states, "50% Signings and 50% Revenue (*Associations Sales*) (emphasis added),"

Ms. Ryder argues that although Revenue needed to be within the "Associations Sales"

16

space, "Signings" meant any and all signings because there is no similar qualifier. ECF No. 67-6 at 36.  Arguing that the lack of specificity in defining "Signings" means any and all signings does not track when there is a Final Authority provision, which explicitly gives Pearson the authority to administer its incentive plans and the calculation of any incentive award payable under an incentive plan, the authority to interpret its incentive plans and any situations not specifically addressed by the incentive plan, and interpretation of individual achievement of goals or targets.  *Id.* at 38.  Mechanically including all signings in the calculation of an employee's signings goal would eviscerate this Final Authority provision.

Ms. Ryder also argues that the decision to exclude the 2015-Wheeler-Deals from the calculation of 2016 signings goals could not apply because it was not reflected in the 2016 SIP.  ECF No. 82-1 at 53-54.  While bothersome to the Court, this argument is not enough to show a breach of contract.  Although a more prudent contract drafter would have customized the language of the 2016 SIP, which was finalized in November 2016, to incorporate the earlier determination regarding the 2015-Wheeler-Deals, the language still gave Pearson the flexibility to operate as it did without breaching the contract by precluding future uncertainties and reserving for Pearson "final decision authority regarding all matters relating to the calculation of any incentive award payable thereunder, interpretation of the Plan, and any situation not specifically addressed by the Plan . . . ."  *See* ECF No. 81 at 10-11, ¶ 50.

### B. Count II: Breach of the Covenant of Good Faith and Fair Dealing

In Count II, Ms. Ryder alleges that Pearson breached the covenant of good faith and fair dealing by acting in bad faith when it refused to pay Ms. Ryder the second installment of her 2014 rollover payment and her 2016 bonus.   ECF No. 23 at 13, ¶¶ 90-94.  As a result of this breach, Ms. Ryder alleges to have suffered damages.  *Id.* at ¶ 94.

In its Motion for Summary Judgment, Pearson argues that Ms. Ryder cannot prove a breach of the covenant of good faith and fair dealing based on the same underlying allegations as her breach of contract claim.  ECF No. 55 at 12.  Pearson further argues that a breach of the covenant of good faith and fair dealing requires a breach of contract and so because there was no breach of contract, there is no breach of the covenant.  *Id.* at 13.  Finally, Pearson argues that it acted in good faith in finding that Ms. Ryder was not entitled to her second rollover payment and 2016 bonus.  *Id.*

"Rhode Island recognizes an implied covenant of good faith and fair dealing in every contract."  *Abbatematteo v. Fed. Hous. Fin. Agency*, No. CV 17-331 WES, 2018 WL 3448241, at *4 (D.R.I. July 17, 2018) (citing *Centerville Builders v. Wynne*, 683 A.2d 1340, 1342 (R.I. 1996)).  "The implied covenant of good faith and fair dealing ensures that contractual objectives may be achieved, and that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Id.* (quoting *McNulty v. Chip*, 116 A.3d 173, 185 (R.I. 2015) (citations and quotation marks omitted)).  "[T]he standard for

18

deciding whether a party has breached the implied covenant of good faith and fair dealing is whether [its] actions in question are free from arbitrary or unreasonable conduct." *Pride Hyundai, Inc. v. Chrysler Fin. Co., LLC*, 263 F. Supp. 2d 374, 394 (D.R.I. 2003).

"[A] claim for breach of the duty of good faith and fair dealing is precluded where the claim arises from the same factual allegations as a breach of contract claim." *Roy v. GE*, 544 F. Supp. 2d 103, 109-110 (D.R.I. 2008). When a plaintiff's claim for breach of the implied covenant "essentially incorporates by reference the allegations in the previous claim for breach of contract, it must be dismissed." *Id.* at 110 (quotation marks omitted); *see also McNulty*, 116 A.3d at 185 ("[A] claim for breach of the implied covenant of good faith and fair dealing does not create an independent cause of action separate and apart from a claim for breach of contract.").

Because Ms. Ryder seeks to reuse the same breach-of-contract allegations to support her implied covenant claim, and the Court has already found no breach of contract, the Court grants Pearson's Motion for Summary Judgment as to Count II.

### C. Count III: Gender Discrimination Under RICRA (R.I. Gen. Laws §§ 42-112-1 et seq.)

In Count III, Ms. Ryder alleges that Pearson discriminated against her based on her gender by placing her on a PIP, denying her bonus and rollover payment, hiring a less qualified male peer for the "Executive Director of Strategic Partnerships," and terminating her in 2018. ECF No. 23 at 14, ¶¶ 95-109; ECF No. 82-1 at 36. Ms. Ryder maintains that these actions constitute unlawful discrimination based on her gender in violation of RICRA. ECF No. 23 at 14, ¶ 108.

The Rhode Island Supreme Court analyzes RICRA claims using substantive federal law from analogous causes of action. *Casey v. Town of Portsmouth*, 861 A.2d 1032, 1037 (R.I. 2004). In the First Circuit, a plaintiff establishes a prima facie case of gender discrimination by showing "(1) the plaintiff was within a protected class; (2) she was qualified for, and adequately performed, her job," and (3), she suffered an adverse employment action." *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 153 (1st Cir. 1990).

Pearson argues that Ms. Ryder's gender claims are unsubstantiated because (1) a nondiscriminatory basis existed for each employment action reflected in contemporaneous documentation and (2) there is a lack of evidence of pretext or gender bias. ECF No. 55 at 17-23. First, as for the BS/A exclusion, Pearson argues that its contemporaneous sales records show the decision was uniformly applied to its BDMs, including to former BDMs, Manny Washington and Josh Collins, who are male. *Id.* at 18. Because male employees' sales were not treated more favorably than Ms. Ryder, Pearson argues that Ms. Ryder cannot show a required element of the prima facie gender discrimination case: less favorable treatment. *Id.* (citing *Sellers v. United States DOD*, 654 F. Supp. 2d 61, 91 (D.R.I 2009) (setting forth the initial burden of a plaintiff to show, among other things, less favorably than similarly situated persons outside her protected class). And, according to Pearson, even assuming Ms. Ryder could show a prima facie case, she has offered no evidence that Pearson's determination was a pretext for discrimination. *Id.* at 19.

As for the PIP, Pearson argues that Ms. Ryder was put on the PIP, not because of gender discrimination, but because her communication and performance was deficient. ECF No. 55 at 20-21. Pearson points out that the PIP states that Ms. Ryder was not meeting the minimum required weekly communication that was directed in the July 15 emails and that her sales efforts only accounted for seven percent of the AGC team's pipeline. *Id.* (citing ECF No. 56 at 16, ¶¶ 126-128). Additionally, Pearson argues that there is no evidence that the PIP issued by Ms. Fisher was based on pretextual reasons because Ms. Ryder does not dispute that Ms. Fisher expressed concern about communication and that she did not know what Ms. Ryder was working on. *Id.* Instead, Pearson argues that Ms. Ryder offers her opinion that she communicated "sufficiently," which is irrelevant because "it is well-settled that an employee's opinion of [her] performance or the soundness or fairness of an employer's business judgment, does not have any bearing in determining whether the employer's articulated reason is a pretext." *Id.* (citing *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 32 (1st Cir. 2007) ("[i]n the absence of any evidence that an employer's decision was pretextual or motivated by discriminatory intent, a court has no right to supersede that decision.))

As for the hiring of the "Executive Director of Strategic Partnerships," Pearson argues that it hired an employee, Mr. Saleet, who had experience with traditional higher education and thus superior qualifications than Ms. Ryder. ECF No. 55 at 22. This, according to Pearson, precludes Ms. Ryder from making her prima facie case. *Id.* Moreover, even if Ms. Ryder could establish a prima facie case, Pearson argues

that she has affirmed her lack of knowledge as to what Mr. Poole considered in selecting Mr. Saleet from the twenty-seven resumes he received and thus she is unable to show that the hiring decision was a pretext for discrimination.  *Id.* at 23.

In response, Ms. Ryder argues that she has set forth a prima facie case of gender discrimination because she is a female who was qualified for and adequately performed her job and still, suffered adverse employment actions.  ECF No. 82-1 at 36.  Ms. Ryder maintains that a jury can reasonably infer discrimination from the irrationality of Pearson's actions with respect to their treatment of Ms. Ryder's BS/A and GARP signings in 2016, as well as that similarly situated employees outside Ms. Ryder's protected classes, such as Mr. Washington, were treated more favorably. ECF No. 82-1 at 36-38.

The Court must decide whether a reasonable jury could find that Pearson discriminated against Ms. Ryder because of her gender.  *Rivera-Muriente v. Agosto-Alicea*, 959 F.2d 349, 352 (1st Cir. 1992) (citing *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir. 1992)).  Because this is before the Court on summary judgment, the Court must and will view the evidence in a light most favorable to the nonmovant, Ms. Ryder.  *Cont'l Cas.*, 924 F.2d at 373.

The First Circuit has held that proving a prima facie case in a discrimination action is "not onerous."  *Smith v. Stratus Computer*, 40 F.3d 11, 15 n.4 (1st Cir. 1994). "If the plaintiff successfully bears this relatively light burden, we presume that the employer engaged in impermissible discrimination."  *Id.* at 15 (citing *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  For efficiency in analyzing Mr.

Ryder's claim, the Court will assume that she has met the burden of showing a prima facie case. *Afolabi v. Lifespan Corp.*, No. CV 14-191-JJM-LDA, 2019 WL 2224893, at *3 (D.R.I. May 23, 2019).

The burden of production then shifts "to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment decision." *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010). To satisfy this burden at the summary judgment stage, a defendant-employer needs to produce "enough competent evidence, *taken as true*, to enable a rational factfinder to conclude that there existed a nondiscriminatory reason for the challenged employment action[.]" *Bonilla-Ramirez v. MVM, Inc.*, 904 F.3d 88, 94 (1st Cir. 2018) (quoting *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 248 (1st Cir. 1997)). "The explanation provided must be legally sufficient to justify a judgment for the [employer]." *Burdine*, 450 U.S. at 255.

"If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating [her] was in fact a pretext for retaliating against [her] for having taken protected [action]." *Hodgens v. Gen'l Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998). In considering evidence of pretext, the Court must focus "on the perception of the decisionmaker [employer] . . . and whether this perception was credible and reasonable." *Gray v. New England Tel. and Tel. Co.*, 792 F.2d 251, 256 (1st Cir. 1986). "It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [she] must 'elucidate specific facts

which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive []."' *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990)).

Pearson has articulated a legitimate, nondiscriminatory reason for each adverse employment action. As for Pearson's failure to pay Ms. Ryder her bonus and rollover compensation, the record reflects that the decision to exclude the 2015-Wheeler-Deals as 2016 signings—and instead compensate as one-time commissions—was applied to Pearson's BDMs, which includes Ms. Ryder's peers, Manny Washington and Josh Collins, as a way to address the remaining deals from the previously discontinued Wheeler Team. *See* ECF No. 81 at 25-26, ¶¶ 96-101.

Its decision to place Ms. Ryder on the PIP stemmed from Ms. Ryder's documented deficient communication with her superior, Ms. Fisher. ECF No. 56 at 16, ¶¶ 126-128. The PIP states that Ms. Ryder was not meeting the minimum required weekly communication that was directed in the July 15 emails. *See id.*

As for Ms. Ryder's allegation that Pearson discriminated against her because of her gender when they hired a male peer as "Executive Director of Strategic Partnerships," there is no evidence to suggest that Pearson's reasons for not hiring Ms. Ryder for the position was motivated by discriminatory intent. Mr. Saleet's credentials—having previously worked at the University of Massachusetts, Dartmouth College, and Colgate University—made him more qualified for the position than Ms. Ryder. *Id.* at ¶¶ 163-64.

Finally, about Ms. Ryder's 2018 termination, Pearson has articulated a legitimate, non-retaliatory reason for its employment decision—that it was eliminated along with other positions in an initiative to reduce staff.

The burden then shifts back to Ms. Ryder, who must prove that Pearson's reason for the adverse employment actions was a pretext for discriminatory motives. *Afolabi*, 2019 WL 2224893, at *4. She has the burden to produce evidence (1) that Pearson fabricated the proffered reasons for the adverse employment actions, and (2) that Pearson's true motive for such actions was gender discrimination. *Id.* "To show pretext, a plaintiff must do more than cast doubt on the rationale proffered by the employer, the evidence must be of such strength and quality as to permit a reasonable finding that the . . . [action] was obviously or manifestly unsupported.'" *Id.* (internal citations and quotation marks omitted). While Ms. Ryder argues that the facts constitute a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination," (ECF No. 82-1 at 47 (quoting *Ahmed v. Johnson*, 752 F.3d 490, 497-98 (1st Cir. 2014)), she does not offer evidence showing or questioning whether Pearson acted not for the legitimate, nondiscriminatory reasons it presented but as pretext for prohibitive discrimination.

Viewing the evidence in a light most favorable to Ms. Ryder, the Court finds that there is no evidence in the record that suggests that Pearson's reason for each adverse employment action was a pretext for gender discrimination. Summary judgment on Count III in favor of the Defendant is thus granted.

### D.  Count IV: Rhode Island Wage Claim Violations

Ms. Ryder alleges Pearson's failure to pay her the second installment of her 2014 rollover payment and her full 2016 sales bonus violates R.I. Gen. Laws § 25-3-3, § 28-12-4.1, § 28-14-1 and § 28-14-2.  ECF No. 23 at 14-15, ¶¶ 110-16.

In its Motion for Summary Judgment, Pearson asserts that Ms. Ryder cannot bring a claim under the R.I. Wage Act because written bonus plans are specifically excluded under R.I. Gen. Laws § 28-14-9.  ECF No. 55 at 13.  Thus, according to Pearson, Ms. Ryder's Wage Act claim fails because the second installment of her 2014 rollover payment and her full 2016 sales bonus were only "earnable" under a detailed written plan and is therefore specifically excluded from the R.I. Wage Act by § 28-14-9.  *Id.*  Pearson also asserts that Ms. Ryder's failure to meet the contingency necessary to earn these bonuses means that the amount was not earned compensation under the R.I. Wage Act.  ECF No. 69 at 4.

Ms. Ryder asserts that the second installment of her 2014 rollover payment is a commission and that Pearson's failure to pay Ms. Ryder was violation of Rhode Island's Wage Act as a matter of law.  According to Ms. Ryder, her 2016 SIP states that her signings goal is $1,000,000 and includes signings of any type.  ECF No. 67 at 18.  Ms. Ryder contends that Pearson's allegation, expressed to Ms. Ryder in early 2017, that Pearson had eventually taken the position that the BS/A signing did not count toward Ms. Ryder's 2016 signing goal because it was a "legacy" deal from 2015 is prima facie evidence of violation of the R.I. Wage Act because the term "legacy" is absent from the 2016 SIP.  *Id.* at 19.  Ms. Ryder asserts that the Pearson executives'

unfettered discretion to interpret the SIP does not give them unfettered discretion to modify the material terms of the SIP because that cannot be done except in writing. *Id.* Because that was not done, Pearson's disregard for the 2016 SIP, according to Ms. Ryder, violates the Rhode Island Wage Act. *Id.*

Under the Rhode Island Wage Act, a commission is a "wage," R.I. Gen. Laws § 28-14-1(4) (definition of wage includes "commission basis"), and a bonus is not a "wage." R.I. Gen. Laws § 28-14-9 ("[N]o agreement contained in a written contract relating to the payment of any bonus in addition to the payment of wages shall be subject to the provisions of this chapter").

This count raises two questions—(i) whether the second installment of the 2014 rollover payment and Ms. Ryder's 2016 sales bonus are "bonuses" for purposes of R.I. Gen. Laws § 28-14-9 and (ii) whether it was earned compensation that Pearson did not pay Ms. Ryder. Because the answer to the second question is that the rollover payment and 2016 sales bonus were not earned compensation, the Court need not answer the first question.

Rhode Island law recognizes an employer's ability to set contingencies on whether commission income is earned. *See Nuzzo v. Nuzzo Campion Stone Enterprises, Inc.*, 137 A.3d 711, 716-17 (R.I. 2016). It is undisputed that, under the 2014 SIP, the second payment of Ms. Ryder's rollover payment was expressly conditioned on whether Ms. Ryder achieved her 2016 signings goal. ECF No. 56 at 3, ¶ 19. And under the 2016 SIP, the payment of her 2016 sales bonus was expressly conditioned on Ms. Ryder achieving her 2016 sales goal. ECF No. 65 at 12, ¶ 59. As

discussed above, Ms. Ryder did not fulfill the contingency of achieving her 2016 signings goal and thus the second rollover payment and her 2016 sales bonus were not earned compensation.  Summary judgment therefore must be granted in favor of the Defendant on this Count IV.

### E. Count V: Intentional Misrepresentation & Count VI Negligent Misrepresentation.

In Count V, Ms. Ryder alleges that Pearson intentionally deceived her to believe that she had met her 2016 sales goals for bonuses.  ECF No. 23 at 15-16, ¶¶ 117-24.  In support of this claim, she points to the fact that she was granted permission to work on the B&S/A in 2016, past when other BDMs had to either close their 2015-Wheeler-Deals, even though the B&S/A deal did not count toward her 2016 signings goal, and she was not informed that the entire GARP signings would not count toward her 2016 goals.  ECF No. 82-1 at 48-52.  As a result of the alleged misrepresentations, Ms. Ryder claims she has suffered and continues to suffer damages, including the failure to receive her 2016 bonus payments and the second installment of her 2014 rollover payment.  ECF No. 23 at 6, ¶ 124.

In the alternative to Count V, Ms. Ryder alleges in Count VI that Pearson is liable for negligent misrepresentation.  *Id.* at 16-17, ¶¶ 125-33.

"[N]egligent misrepresentation is tort of deceit not of mere negligence."  *T.G. Plastics Trading Co. v. Toray Plastics (Am.), Inc.*, 958 F. Supp. 2d 315, 330 (D.R.I 2013).  The elements of a claim for negligent misrepresentation include (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its

truth or falsity, or must make the representation when he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation. *Lang Pharma Nutrition, Inc. v. Aenova Holding Gmbh,* No. CV 16-371 S, 2017 WL 3327572, at *2 (D.R.I. Aug. 3, 2017). The elements for intentional misrepresentation are the same, except the second element requires a knowing misrepresentation of fact. *Id.*

Pearson contends that these claims fail because Ms. Ryder cannot meet her burden to show a knowingly false statement. ECF No. 55 at 14-15. Pearson also argues that Ms. Ryder lacks another essential element in her misrepresentation counts, justifiable reliance. *Id.* According to Pearson, Ms. Ryder cannot show "justifiable reliance" where the 2016 SIP expressly states that Pearson retains the unfettered discretion to interpret the SIP, "regardless of any statements made by any manager or employee of Pearson to the contrary." *Id.* These express contract provisions, according to Pearson, prevent Ms. Ryder from showing that she justifiably relied on any misrepresentation, whether intentional or negligent. *Id.*

In response to Pearson's Motion for Summary Judgment on the misrepresentation claims, Ms. Ryder asserts that she rightly relied on her managers' direction to work on the BS/A and GARP deals and thus it was reasonable for her to expect that the BS/A and GARP deals would count toward her 2016 signings goal. ECF No. 82-1 at 50. Ms. Ryder notes that Ms. Fisher admitted that she knew as early as September 2016 that the B&S/A deal would not count toward Ms. Ryder's 2016

signings goal and that at least some of the GARP deal would not count either. Because Ms. Fisher did not tell Ms. Ryder that these deals would not count toward her 2016 signings until November, she claims that a jury can find this to be a misrepresentation.  ECF No. 82 at 50.

Viewing the evidence in a light most favorable to the nonmovant, Ms. Ryder, the Court finds that a reasonable jury could find that Pearson intentionally or negligently misrepresented the inclusion of the B&S/A deal and part of the GARP deal toward Ms. Ryder's signings goal.  While the language of the 2016 SIP states that Pearson's finance department had the discretion to interpret the 2016 SIP regardless of statements made by personnel to the contrary, which Pearson argues precludes Ms. Ryder's reliance on the actions of her superiors, Ms. Ryder did not see the final 2016 SIP, with this language, until November 2016.  ECF No. 81 at 8, ¶ 38. Until that point, Ms. Ryder was operating under the direction of her supervisors, Ms. Fisher and Mr. Kuennen, both of whom authorized her to keep working on the BS/A deal and the GARP deal and neither of whom indicated these deals would not count toward her 2016 signings goal until it was too late for Ms. Ryder to change course. *See* ECF No. 65 at 5-7, ¶¶ 21, 26, 33.  It is thus a jury question whether this nondisclosure, negligently or intentionally, led Ms. Ryder to detrimentally believe that she was on target to meet her 2016 signings goal when in fact she was not.  *See Gupta v. Customerlinx Corp.,* 385 F. Supp. 2d 157, 163 (D.R.I. 2005).

**F.  Count X: Retaliation—Failure to Hire/Promote (R.I. Gen. Laws §§ 42-112-1 et seq.)**

In Count X, Ms. Ryder alleges that Pearson's failure to interview and failure to hire her for the Executive Director Strategic Partnerships position was in retaliation for her participation in protected activity, a violation of RICRA.  ECF No. 23 at 19, ¶¶ 163-71.  According to Ms. Ryder, it is undisputable that she challenged disability discrimination done by Pearson when she protested the contents of, and intent behind, the PIP issued to her in 2016.  ECF No. 82-1 at 48.  That protest, according to Ms. Ryder, constitutes protected activity.  *Id.*

Pearson argues that Ms. Ryder's claim of retaliatory failure to hire lacks any evidence.  ECF No. 55 at 26.  Noting that Pearson was hiring for an Executive Director Strategic Partnerships to sell to traditional higher education colleges and universities in the New York and New Jersey area, Pearson asserts that Mr. Saleet was selected for the position, because of his relevant skills, experience, and his relationship with higher education institutions.  *Id.*  According to Pearson, Mr. Saleet had been promoted twice, and had substantial experience working in traditional higher education institutions, including Dartmouth College, Colgate University, and the University of Massachusetts, while Ms. Ryder's resume reflected no prior employment at a traditional higher education college or university or other relevant experience.  *Id.* (citing ECF No. 56 at 20, ¶¶ 163-64).  Therefore, according to Pearson, the summary judgment record shows that Mr. Saleet had superior qualifications to Ms. Ryder, precluding Ms. Ryder from showing a prima facie case or pretext for his

selection. *Id.* (citing *Colman v. Faucher*, 128 F. Supp. 3d at 492, 595 (a prima facie case requires a person with equal or inferior qualifications was hired)).

Pearson further argues that Ms. Ryder is precluded from proving a second element of the prima facie case because there is no evidence that Mr. Poole knew about her legal action. *Id.* at 27. Finally, even if Plaintiff could establish a prima facie case, Pearson argues that Ms. Ryder has affirmed her lack of knowledge as to what Mr. Poole considered in selecting Mr. Saleet from the twenty-seven resumes he received. *Id.* (citing ECF No. 56 at 20, ¶ 165). According to Pearson, Ms. Ryder is thus unable to show that the hiring decision was a pretext for retaliation. *Coleman*, 128 F. Supp. at 495 (articulating the plaintiff's burden to show that its justification was "a mere pretext disguising a discriminatory motive").

In response, Ms. Ryder argues that a jury can find that Pearson retaliated against her based on her disability. ECF No. 82-1 at 47. According to Ms. Ryder, it is undisputed that Ms. Ryder has attention deficit hyperactivity disorder ("ADHD") and is disabled under the law. *Id.* Additionally, according to Ms. Ryder, it is undisputable that she opposed disability discrimination by filing a complaint with the human resources office regarding the contents of, and intent behind, the PIP Pearson issued to her in 2016. ECF No. 82-1 at 48. From these facts, Ms. Ryder argues that a jury could find retaliation. *See id.*

To establish a prima facie case for retaliation, a plaintiff must show that (1) the employee was engaged in protected activity; (2) the employee suffered an adverse employment action; and (3) there was a causal connection between the protected

activity and the adverse employment action. *Quiles-Quiles v. Henderson*, 439 F.3d 1, 8 (1st Cir. 2006).

The protected activity alleged by Ms. Ryder is the complaint she filed with Pearson's human resources office about the PIP. ECF No. 82-1 at 48. But there is insufficient evidence to support that there was a causal connection between this protected activity and the adverse employment action. *See* ECF No. 81 at 40, ¶¶ 163-65. The record lacks any evidence that Mr. Poole, who made the hiring decision, was aware of Ms. Ryder's disability or the complaint she filed.[2] The record does, however, show that Mr. Saleet was more qualified than Ms. Ryder for the desired position because of his background in traditional higher education. *Id.* at ¶¶ 163-64. Ms. Ryder has thus failed to establish her prima facie retaliation case. A reasonable jury could not find that Mr. Poole retaliated against Ms. Ryder and therefore summary judgment for the Defendant is granted.

### G. Count XI: Retaliation–Termination (R.I. Gen. Laws §§ 42-112-1 et seq.); Count XII: Whistleblower Retaliation (R.I. Gen. Laws § 28-50-1 et seq.)

In Count XI, Ms. Ryder alleges that Pearson terminated her employment in retaliation for her filing of a charge of discrimination with the RICHR in 2017, alleging disability and gender discrimination under the Rhode Island Fair Employment Practices Act, and for the lawsuit in this Court. ECF No. 23 at 20-21, ¶¶ 173-75. And in Count XII, Ms. Ryder alleges that Pearson's decision to fire her

---

[2] Ms. Ryder's superior, Ms. Fisher, was also not aware of Ms. Ryder's ADHD disability. ECF No. 67-1 at 30.

was in retaliation for her participation in protected activity, thus violating the Rhode Island Whistleblower Protection Act.  ECF No. 23 at 21-22, ¶¶ 186-88.

Pearson argues that because Ms. Ryder has no information that links her legal claims with her selection for layoff, she cannot establish a requisite element of her prima facie case of retaliation, and thus summary judgment should be entered on behalf of Pearson.  ECF No. 55 at 28.  And according to Pearson, even if Ms. Ryder could establish a prima facie case of retaliation, Pearson has set forth the non-retaliatory basis for her selection—that Mr. Malek eliminated Ms. Ryder's position, along with other positions, in an initiative (Project Oak) intended to reduce the "overstaffed" AGC team.  *Id.* (citing ECF No. 56 at 22-23, ¶¶ 195, 199-200).   In addition, Mr. Malek has testified that he had supervised multiple employees with bonus disputes and had employees on his team who sued Pearson successfully and that it did not make any difference regarding termination decisions.  *Id.* (*citing* ECF No. 56 at 24, ¶¶ 206-207).  Moreover, Pearson points out that there was a twenty-six-month period between the letter from Ms. Ryder's attorney in April 2017 and the layoff decision in June 2018.  According to Pearson, this cannot support an inference of causation.  *Id.* at 28 (citing *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 25 (1st Cir. 2004) (proximity of a month may support a prima facie case, but noting that three and four month periods have been held insufficient to establish a causal connection based on temporal proximity)).

To establish a prima facie case of retaliation, a plaintiff must establish that (1) she engaged in protected conduct; (2) she experienced an adverse employment action;

and (3) there was a causal connection between the protected conduct and the adverse employment action. *Calero-Cerezo*, 355 F.3d at 25.[3]

Viewing the evidence in a light most favorable to Ms. Ryder, the Court finds that a reasonable jury could not infer that Pearson retaliated against Ms. Ryder in terminating her position. Although Ms. Ryder was engaged in protected activity when she was terminated, Pearson has articulated a legitimate, non-retaliatory reason for its employment decision—that it was eliminated along with other positions in connection with Project Oak to reduce the staff of the AGC team, which was not "selling effectively" and that Ms. Ryder was underperforming (based on her low performance rating).[4]

With this proffered reasoning, Pearson shifts the burden back to Ms. Ryder to show that the reason is in fact pretext and that the employment action was instead the result of Pearson's retaliatory animus. *Calero-Cerezo*, 355 F.3d at 26. She has the burden to produce evidence, (1) that Pearson fabricated the proffered reason for termination–reduction of the overstaffed AGC team, and (2) that Pearson's true motive to terminate her was retaliation. *Jardin v. CoxCom, LLC*, 320 F. Supp. 3d

---

[3] Similarly, under the Rhode Island Whistleblower Protection Act, a plaintiff must show the following: (1) that she engaged in protected whistleblowing conduct as defined by the Whistleblower Protection Act; (2) that he suffered an adverse employment action at the time or thereafter; and (3) that the adverse action was causally related to the protected conduct. *Chagnon v. Lifespan Corp.*, C.A. No. 15-493S, 2017 WL 3278952, at *6 (D.R.I. June 19, 2017) (adopted 2017 WL 3278858 (D.R.I. Aug. 1, 2017)).

[4] Along with terminating Ms. Ryder's position under Project Oak, Pearson terminated the positions of at least six other employees and eliminated the need for eight open positions. ECF No. 81 at 48, ¶ 200.

373, 378 (D.R.I. 2018).  To show pretext, a plaintiff "must do more than cast doubt on the rationale proffered by the employer[;] 'the evidence must be of such strength and quality as to permit a reasonable finding that the . . . [termination] was obviously or manifestly unsupported.'" *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 248-49 (1st Cir. 1997) (quoting *Brown v. Tr. of Boston Univ.*, 891 F.2d 337, 346 (1st Cir. 1989)).

Ms. Ryder has failed to make this showing of pretext or raise a genuine issue of fact that would demonstrate any sham or pretext intended to cover up Pearson's retaliatory motive in terminating her.   *See Calero-Cerezo*, 355 F.3d at 26. Importantly, Ms. Ryder has failed to draw a causal relationship between her protected activity and her termination, specifically failing to address the twenty-six-month period between the letter from Ms. Ryder's attorney and her layoff decision. Temporal proximity in the causation element is key.  The protected conduct and adverse employment action must be close to prove a retaliation claim.   *Pena v. Honeywell Int'l*, 923 F.3d 18, 32 (1st Cir. 2019).   "Without some corroborating evidence suggestive of causation . . . a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action." *Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010).

Because Ms. Ryder has failed to draw a causal relationship between her protected activity and her termination and to point to record evidence that would demonstrate any pretext intended to cover up Pearson's retaliatory motive, a jury

36

could not find that her termination was in retaliation for protected activity. Summary judgment for Pearson is thus granted for Counts XI and XII.

## IV.   CONCLUSION

For the reasons stated, the Court GRANTS the Defendant's Motion for Summary Judgment on Counts I, II, III, IV, X, XI, and XII but DENIES its Motion for Summary Judgment on Count V and VI.  ECF No. 54.  The Court DENIES the Plaintiff's Motion for Summary Judgment on Counts I and IV.  ECF No. 66.

The Court DENIES the Defendant's Motions to Strike.  ECF Nos. 71, 89, 98. The Plaintiff's Motion for Reconsideration is DENIED as moot.  ECF No. 99.


IT IS SO ORDERED.


<u>s/ John J. McConnell, Jr.</u>

John J. McConnell, Jr.
Chief Judge
United States District Court

September 14, 2020

37